IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

G.H., et al.              :      CIVIL ACTION
                          :
        v.                :
                          :
GREAT VALLEY SCHOOL DISTRICT  :      NO. 12-2735


AMENDED MEMORANDUM

McLaughlin, J.                                    May 20, 2013

        The plaintiffs G.H., et al. initiated this case in
their own right and as parents of minor-plaintiff S.H., who
attended public school in the defendant Great Valley School
District during the 2010-11 school year.  They contend that the
defendant has violated S.H.'s right to appropriate education
under the Individuals with Disabilities Education Improvement
Act (IDEA), and they seek reimbursement of private school
tuition and related fees.

        Upon the issuance of a decision from the
administrative due process hearing officer denying the
plaintiffs' claims, the parties now submit cross-motions for
judgment on the administrative record to the instant Court.  For
the reasons stated below, the Court affirms the Hearing
Officer's decision in its entirety.  It thus grants the
defendant's motion and denies the plaintiffs' motion.

I.  Factual History[1]

        The plaintiffs ("Parents") are the adoptive parents of

S.H., whom they legally adopted from Cambodia as an infant in

2001.  For all relevant time periods, the plaintiffs resided

within the Great Valley School District ("the District") in

Pennsylvania.  McElligott F.F. 1, ¶ 1.

        S.H. attended kindergarten at a private school in the

area.  When she was in first grade, Parents sought a

comprehensive evaluation from the District for academic concerns

in language arts, speech and language, attention issues, and

social-emotional issues.  The District conducted a number of

assessments, interviewed S.H.'s parents and teachers, and issued

an initial evaluation report ("February 09 Report").  The Report

concluded that S.H. had a speech and language impairment; it

thus initiated speech and language support at the private school

from a local intermediate unit.  The Report did not identify

S.H. as a student with social-emotional or behavioral needs.  It

_____

[1] Unless stated otherwise, the following set of facts is taken
from the factual findings issued by the Hearing Officer in a
decision dated March 27, 2012 (hereinafter "McElligott F.F.").
In IDEA cases, a district court is "required to defer to the
[administrative proceedings'] factual findings unless it can
point to contrary nontestimonial extrinsic evidence on the
record."  S.H. v. State-Operated Sch. Dist. of City of Newark,
336 F.3d 260, 270 (3d Cir. 2003).

concluded that S.H. was ineligible for special education related to those issues.  Id. ¶ 7-8, 16, 19.

In the spring of 2010, S.H. began to experience increased difficulty with social issues at school.  In addition, her behavior at home intensified and deteriorated, which manifested in the form of tantrums.  As a result of these concerns, as well as concerns about S.H.'s reading ability, Parents decided to remove S.H. from private school for the following year and began discussions with the District to enroll her in a second-grade class at General Wayne Elementary School. Id. ¶ 20-22.

Parents and District administrators held meetings and conducted evaluations in preparation for S.H.'s enrollment within the District.  In May 2010, the local intermediate unit which had been meeting with S.H. performed an evaluation that found that S.H. exhibited below average results in speech and language.  In June 2010, S.H.'s Individualized Education Program (IEP) team developed an IEP to reflect its updated understanding of S.H.'s educational needs ("June 2010 IEP").  The IEP Report was based on the local intermediate unit's evaluations, a private occupational therapy evaluation, S.H.'s grades, and the February 09 Report.  Id. ¶ 23, 25.

The District subsequently issued a notice of recommended educational placement (NOREP) in June 2010.  The NOREP recommended that S.H. continue to receive special education for her speech and language.  It did not re-evaluate S.H.'s behavioral problems or put forth a behavioral plan involving one-on-one support.  It also did not recommend that S.H. be placed in Extended School Year (ESY), or summer school, services.  Id. ¶ 23-28; 33; see also Pl. Mot. at 5; Def. Mot. at 8, 15, 17-18.

S.H. had a number of tantrums when she was at home for the summer.  On June 22, she had one particularly violent tantrum, which culminated in police involvement and a visit to the Devereux Psychiatric Hospital.  The next day, S.H. had another tantrum, during which she grabbed a butcher knife and stabbed a chair.  Parents re-admitted S.H. to Devereux for a week.  McElligott F.F ¶ 30.  S.H. was diagnosed by her private psychiatrist, Dr. John Williams, with Disruptive Behavioral Disorder, Oppositional Defiant Disorder, and Attention Deficit Hyperactivity Disorder (ADHD).[2]  Pl. Mot. exh. 19 at 1.

_____

[2] In addition, S.H. has since been diagnosed with reactive attachment disorder and other cognitive and mood disorders.  Pl. exh. 24 (report of Dr. Kelly); see also Tr. Hr'g 4/10/13 6:4-6.

The District was aware of these tantrums, and it was aware that S.H. was receiving medical and psychiatric services. In September 2010, S.H.'s IEP team, including Parents and District employees, decided that the June 2010 IEP did not need to be revised.  At that point, Parents signed the June 2010 NOREP, formally agreeing with the District's recommendation. McElligott F.F. ¶ 33.

S.H.'s tantrums at home continued throughout the fall of 2010.  Her behavioral problems increased in December 2010 with the introduction of a new student into S.H.'s class.  S.H. began exhibiting jealous behavior about the new student with one particular student ("social triad problem") that led to issues at recess and during gym and a number of violent tantrums at home.[3]  Id. ¶ 37-39.

In particular, on February 16, 2011, S.H. had a violent tantrum at home.[4]  As a result of the tantrum, Parents

_____

[3] There is evidence that S.H.'s teachers were concerned about the social triad problem.  For instance, S.H.'s teachers communicated with Parents when events occurred during school and asked them to speak with S.H. about the issue at home.  Pl. exh. 50 at 23, 34 (emails between S.H.'s teacher and Parents).

[4] According to Parents, and undisputed by the District, S.H. began fighting with her sister on the bus, and began screaming and throwing furniture at home.  She also grabbed a pair of

5

admitted S.H. into Devereux, where she stayed for one week.
Immediately upon her return, she threw another tantrum, and
Parents returned her to Devereux until March 15, 2011.  The
tantrums continued after S.H. returned from Devereux.  Id. ¶ 42-
43, 52.

S.H.'s IEP Team was convened on April 13, 2011 ("April
2011 IEP").  At this meeting, Parents expressed their belief
that S.H. should be identified as a student requiring social,
emotional, and/or behavioral support.  The District acknowledged
the parents' concerns but felt that those issues were not
surfacing in the school environment such that they needed to be
addressed in the IEP.[5]  The subsequent NOREP recommended that
S.H. continue to be identified as a student with a speech and
language impairment, but did not add accommodations related to
S.H.'s behavioral issues.  It also did not grant ESY services

---

scissors from a sewing kit.  Pl. exh. 57 at 3 (parents' notes);
see also Tr. Hr'g 4/10/13 11:11-15.

[5] The District based their decision partially on submissions from
her teachers.  For example, her third grade regular education
teacher noted that although S.H. sometimes struggled with being
upset, "a quick discussion about what is upsetting her is all
that is needed."  The teacher also wrote that "[i]t should be
noted that S.H. has improved in this area since the beginning of
the school year."  Pl. exh. 14 at 7.

for Summer 2011.  Parents disagreed with the recommendation.
Id. ¶ 45-46.

In the ensuing weeks, Parents requested a District in-home assessment of S.H..  They also requested an IEP team meeting and expressed an intent to look into a residential treatment facility for S.H..  The District denied the Parents' request for an in-home assessment, but requested permission to initiate a reevaluation of S.H. (which eventually culminated in a Reevaluation Report).  Id. ¶ 46-47.

In or around late May to early June, following an interagency meeting involving Parents, an education advocate, District personnel, and community-based mental health services employees, S.H. was approved for admission to a local residential treatment facility.  This process was approved by the community mental health system, which recommended potential local placements for S.H..  Parents did not find any of these placements acceptable, and began to search outside of the regional area.  Id. ¶ 49, 51, 57.

Also around that time, the District, as part of its Reevaluation Report process, initiated a functional behavior assessment (FBA) of S.H., which was informed by observations of Parents and District staff.  Parents recorded multiple

7

problematic behaviors and tantrums at home.  The District school counselor, who observed S.H. eight times over one week, recorded no problematic behaviors at school.  Id. ¶ 50.

S.H. completed third grade at General Wayne.  Her report card for the 2010-11 year reflected no academic difficulties (As and Bs) and made one note of behavioral issues.[6] S.H. scored in the proficient range in mathematics and reading on the state assessment.  Id. ¶ 53-55.

At home, S.H. continued to exhibit serious behavioral problems.  In June 2011, Dr. Williams, S.H.'s private psychologist, evaluated S.H.'s behavior and concluded that she qualified for special education as a student with a serious emotional disturbance.  At that point, parents informed the District of their intention to place S.H. at Sandhill/Del Rio, a private therapeutic facility in New Mexico.[7]  Parents also informed the District of their intent to seek reimbursement from

_____

[6] Specifically, S.H.'s gym teacher remarked that S.H. "occasionally has difficulty in dealing with others in small group situations."  In the following marking period, the same teacher noted that S.H. "has shown better self-control this marking period, and is cooperative with others most of the time."  Id. at ¶ 54.

[7] Sandhill's facility also provides an educational component through an affiliated private school.  Id. at ¶ 56.

the District for the placement.  S.H. was enrolled in Sandhill in July 2011.  Id. ¶ 56-59.

The District continued to perform its Reevaluation process, receiving input from Parents, S.H.'s teachers in the District and at Sandhill, private psychiatric and neuropsychological evaluations, and other academic assessments, including the June FBA.[8]  In October 2011, the District issued its Reevaluation Report.  Because S.H.'s speech skills had improved, it concluded that S.H. no longer qualified as a student with a speech and language impairment.  It also concluded that S.H.'s social-emotional issues "did not manifest themselves in the school environment such that there was interference with the student's education or the education of others."  As a result, the Report concluded that S.H.'s ADHD and behavior did not qualify as IDEA-eligible impairments.  However, the Report stated that S.H. did qualify as a "student with a disability" under Section 504, and issued a Section 504 plan to

---

[8] The Report analyzed two sets of assessments related to behavior.  In both assessments, Parents reported consistently elevated ratings in most areas.  S.H.'s "house parent" at Sandhill showed some elevated ratings, including some school-related measures, but less in number and intensity than parents.  Ratings from Sandhill and District teachers reported no elevated ratings in the classroom setting.  Id. ¶ 64-65.

address speech and language articulation issues and emotional regulation issues.  Id. § 60-69.  Following this Report, Parents opted against re-enrolling S.H. in a District school.  Tr. Hr'g 4/10/13 32:2-15.


II.  Administrative Hearing

        In October 2011, Parents filed a complaint for a special education administrative due process hearing, which was assigned to Hearing Officer Jake McElligott, Esq.  The complaint alleged violations of the Individuals with Disabilities Education Improvement Act for failure to determine that S.H. was eligible for special education as a student with an emotional disturbance or ADHD; it also alleged that S.H. was denied a free and appropriate public education (FAPE) for the 2010-11 school year, inclusive of summers.

        H.O. McElligott conducted five days of administrative evidentiary due process hearings between January and February 2012.  Throughout the hearings, he heard testimony from S.H.'s mother, District witnesses, witnesses from Sandhill, S.H.'s private psychiatrist, a District special education

10

administrator, and a business administrator from Sandhill.[9]  On
March 27, 2012, the H.O. issued his decision, finding for the
District in its entirety.  Specifically, he found that S.H.'s
issues with respect to behavior and ADHD were not eligible under
the terms of IDEA because she "did not exhibit any significant
social, emotional, and behavioral outbursts in the educational
environment at the District such that there was any adverse
effect on the student's educational performance."  As a result,
the H.O. held that S.H. was provided FAPE by the District at all
relevant times, and that she was not entitled to compensatory
education or reimbursement of her tuition at Sandhill.  He also
found that Parents were not entitled to expert witness fees.

In addition to the factual findings described above,
the H.O. made findings of credibility regarding the witnesses
who had testified at the hearings.  The H.O. found that
everybody who testified at the hearings testified credibly.
However, he accorded less weight to S.H.'s treating
psychiatrist, the District's special education administrator,

---

[9] The H.O. excluded evidence on a DVD provided by Parents in
which Parents had recorded a number of S.H.'s serious tantrums.
His decision was on the ground that the evidence on the DVD
"will be repetitive [of] what has clearly come through evidence
in terms of testimony."  N.T. at 139:9-13.

11

and the business administrator from Sandhill.  He explained that
these witnesses were accorded less weight because they did not
work directly with S.H. in an educational environment.  Id. ¶
70-75.

III. Analysis

        Upon the conclusion of the administrative hearing, the
parties filed cross-motions for judgment on the administrative
record in the instant proceeding.  They seek this Court's
judgment on a number of decisions made by the Hearing Officer.
First, and primarily, the Court must decide whether the District
should have provided S.H. with special education and related
services for her behavioral issues.[10]  The H.O. found that S.H.
was not eligible for special education and related services
under the IDEA's definition of emotional disturbance or other
health impairment.[11]

───────────────────

[10] As noted in the factual recitation, S.H. was identified as
IDEA-eligible for her speech and language needs, and she
received continuous support for those issues throughout the
relevant time period.  Parents are not seeking any recourse
related to the speech and language special education received by
S.H..  Tr. Hr'g 4/10/13 14:5-15.

[11] Hereinafter, the term "IDEA" refers to what has been renamed
the Individuals with Disabilities Education Improvement Act.

Then, guided by its decision on S.H.'s IDEA eligibility, the Court must next decide whether the District provided S.H. FAPE during the 2010-11 school year and the summers that preceded and followed.  It must also decide whether the parties are entitled to any sort of remedy, including compensatory education, tuition reimbursement, and expert testimony fees.

A. Legal Standard

Under the IDEA, a district court issuing a judgment on the administrative record is instructed to review the records of the administrative proceedings, and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(c)(i-iii).  The Supreme Court has construed this statutory language to require that the district court give "due weight" to state administrative proceedings.  Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).

Recognizing that specialized fact-finding is an important function of the IDEA's hearing process, the Third

Cf. Ballard v. Phila. Sch. Dist., 273 Fed. Appx. 184, 185 n.1 (3d Cir. 2008).

Circuit has held that "[f]actual findings from the administrative proceedings are to be considered prima facie correct."  S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003).

Included in the category of factual findings, and thus entitled to a "prima facie correct" standard, is an administrative officer's determination of whether an issued IEP serves a student's needs.  Id., 336 F.3d at 271; see also Rowley, 458 U.S. at 206.  The hearing officer's credibility determinations are also held to this standard; the district court should accept these determinations "unless nontestimonial, extrinsic evidence in the record would justify a contrary conclusion."  D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (internal citations omitted).

However, the district court should not give deference to legal holdings made by the hearing officer.  Warren G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 83 (3d Cir. 1999).  At least two appellate courts have held that eligibility under the IDEA is a matter of statutory interpretation, a legal holding. Muller v. Comm. on Special Educ., 145 F.3d 95, 102 (2d Cir. 1997); J.H. v. Republic R-III Sch. Dist., 632 F.3d 1024, 1026 (8th Cir. 2011); but see Napa Valley Unified Sch. Dist., 496

14

F.3d 932, 937 n.1 (9th Cir. 2007) (finding IDEA eligibility analysis to require something "more deferential" than de novo).

On the administrative level and upon appeal, the burden of persuasion is on the party seeking relief. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012).

A.    Eligibility Under the IDEA

A student is eligible for IDEA support if, after undergoing a full and individual initial evaluation, she is found to 1) have one or more of the disabling conditions found in 20 U.S.C. § 1401(3) or 34 C.F.R. § 300.8(a)(1), and 2) as a result of that disabling condition, she requires specially designed instruction.  34 C.F.R. § 300.8(a).  The relevant disabling conditions in the instant case are emotional disturbance and ADHD.  Pl. Mot. at 27, 29.

The Second and Eighth Circuits have held that the issue of whether a particular student satisfies the definition of "emotionally disturbed," as set forth in the relevant state and federal regulations, should be reviewed de novo.  Muller v. Comm. on Special Educ., 145 F.3d 95, 102 (2d Cir. 1997); J.H. v. Republic R-III Sch. Dist., 632 F.3d 1024, 1026 (8th Cir. 2011). On a motion for judgment on the administrative record, the

relevant facts as to behavior and performance are not in dispute; thus, "the district court [is] as well-positioned as the state administrative officials to determine [the student's] eligibility."  <u>Muller</u>, 145 F.3d at 102.  The determination to be made is a matter of statutory interpretation, a question of law. <u>But see</u> <u>Napa Valley Unified Sch. Dist.</u>, 496 F.3d 932, 937 n.1 (9th Cir. 2007) (requiring something "more deferential" than <u>de novo</u> in "fact-intensive" IDEA eligibility determinations).[12]

      1.  <u>Emotional Disturbance</u>

      The H.O. held that S.H. is not a student with an emotional disturbance under the IDEA.  The IDEA defines an "emotional disturbance" as:

      "[A] condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that <u>adversely affects a child's educational performance</u>:

    A.  An inability to learn that cannot be explained by intellectual, sensory, or health factors
    B.  An inability to build or maintain satisfactory interpersonal relationships with peers or teachers

---

[12]  The Court notes that because neither party briefed the issue of the review standard for IDEA eligibility, and because the Court's decision would remain the same under either the <u>de novo</u> or modified <u>de novo</u> standard, this issue is not dispositive in the instant case.

      C.    Inappropriate types of behavior or feelings under normal circumstances

      D.    A general pervasive mood of unhappiness or depression

      E.    A tendency to develop physical symptoms or fears associated with personal or school problems."

34 C.F.R. § 300.8(b)(4)(i) (emphasis added).  Put another way, a plaintiff must demonstrate that the student 1) exhibits, to a marked degree, some of the behaviors listed in A-E, and 2) as a result of those behaviors, her educational performance was adversely affected.  The Court proceeds in this order.

          a.  <u>Display of Listed Behavior</u>

      The Court is persuaded that S.H. satisfies the first element of IDEA eligibility.  In the course of one school year, S.H. flew into at least five violent tantrums at home, throwing furniture and threatening the parents with boiling water, knives, and scissors.[13]  In addition, S.H. had a combustible relationship with two girls at school, and as a result of her jealous behavior, S.H. had several "problematic," "emotional interactions" at school.  S.H. was subsequently admitted into a

---

[13] Relatedly, the Court holds that it was not improper for the H.O. to exclude the DVR recording of S.H.'s tantrums from the administrative hearing.  The subject of the recording had been discussed at length during testimony and was later noted in detail in the H.O.'s factual findings.

local mental health treatment facility for weeks at a time.
Taken together, S.H. has demonstrated, to a marked degree,
"inappropriate types of behavior or feelings under normal
circumstances" and/or a "pervasive mood of unhappiness."

        b.  "Adversely Affected" Educational Performance

        Second, the plaintiff must demonstrate that the
student's behaviors adversely affected her educational
performance.  34 C.F.R. § 300.8(b)(4)(i).  The Court is not
persuaded that this occurred in the instant case.

        S.H.'s case is unique in that there is a distinct
divide between her behaviors at school and her behaviors at
home.  At school, S.H. was "respectful to adults and most of her
classmates."  Pl. exh. 14 at 7.  She had a few conflicts with
classmates, which resulted in some conversations with teachers,
but nothing that struck her teachers as out of the ordinary.  At
home, she by all accounts lashed out.

        Courts have been clear that emotional issues which
occur at home are still relevant to IDEA analysis "so long as
those problems had a significant effect on her ability to
learn."  Muller, 145 F.3d at 104, n.6.  Put another way, the
fact that outbursts occurred at home does not in and of itself

18

deprive those outbursts of relevance; the question is whether the outbursts adversely affected her educational performance.

In deciding whether behavior at home impacted educational ability, courts have considered the following factors:  1) grades; 2) assessment results; 3) testimony of mental health professionals on the severity of the emotional disturbance; 4) testimony of educators and mental health professionals on whether special education services were needed; 5) whether therapy focused on issues at home or at school; and 6) school attendance.  See, e.g., Johnson v. Metro Davidson Cnty. Sch. Sys., 108 F. Supp. 2d 906, 918 (M.D. Tenn. Aug. 10, 2000); John Doe v. Board of Educ., 753 F.Supp. 65, 70 (D. Conn. 1990); R.C., et al. v. York Sch. Dep't., No. 07-177, 2008 WL 4427194, at *8 (D. Me. Sep. 25, 2008); St. Joseph-Ogden Community High Sch. Dist. No. 305 v. Janet W., No. 07-2079, 2008 WL 170693, at *14 (C.D. Ill. Jan. 17, 2008); Board of Educ. of Montgomery Cnty. v. S.G., No. 2005-0323, 2006 WL 544529, at *13 (D. Md. Mar. 6, 2006); Katherine S. v. Umbach, No. 11-T-982, 2002 WL 226697, at *10-14 (M.D. Ala. Feb. 1, 2002).

S.H.'s grades and her assessment results during her year at General Wayne do not reflect a negative educational impact.  S.H.'s grades throughout the year were above average,

all As and Bs.  She also scored in the proficient range in mathematics and reading on the statewide assessment.  There is no evidence on the record that these grades and test results demonstrate a regression from her educational performance at the private school.

Moreover, S.H.'s school teachers and educators testified at the administrative hearing that her behavior in school did not warrant special education support.  For example, S.H.'s primary teacher stated that she observed S.H. to be self-controlled and responsible.  The teacher saw S.H. upset or frustrated a handful of times during the school year, but generally, her behavior at school did not stand out.  This was corroborated by testimony from S.H.'s speech and language therapist, physical education teacher, and guidance counselor, all of whom were found credible by the H.O.  It is also corroborated by S.H.'s report card, which throughout the course of the year reflected satisfactory performance and a few, isolated problems with behavior.  N.T. 1345:3-6, 18-21; 1370:4-8; 1311:13-1314:23; 1019:4-11; see also McElligott F.F. ¶ 54.

With regard to S.H.'s therapy, the majority of the evidence suggests that S.H.'s therapeutic needs did not center on school-related issues.  In its discharge summary, Devereaux

did not identify school as a source of stress for S.H., but
rather "issues of adoption and not feeling wanted . . . problems
with her primary support group, particularly her mother and
sister."  Pl. exh. 13 at 6.  Indeed, the original report of
plaintiffs' treating psychiatrist focused on S.H.'s home and
family life, as well.  As precipitating factors of S.H.'s
behavior, it listed "increasing expectations," her "chaotic home
life," and the "presence of three sisters."  It did not mention
stress at school.  Pl. exh. 19 at 10-14.

        The Court also considers whether S.H.'s absences from
school satisfy the IDEA's adverse effect requirement.  S.H. was
absent from school for approximately one month, during which she
was hospitalized at Devereaux and did not receive any schooling
from the District.  However, S.H.'s absence from school is by
itself insufficient to demonstrate that her behavioral issues
had an adverse impact on her educational performance.  Other
courts have found no adverse effect for even longer stretches of
absences.  E.g., Katherine S., 2002 WL 226697, at *6
(hospitalized for three months); St. Joseph-Ogden, No. 07-2079,
2008 WL 170693, at *1 (hospitalized, suspended twice, and
eventually expelled).  In the instant case, S.H.'s teacher
testified that she did not need time to catch up following her

21

absence, which was corroborated by her performance on state assessments.  N.T. 1484:22-25.

Parents point to two specific lines of evidence for the proposition that S.H.'s behaviors had an adverse impact on her educational performance:  a decline in her IQ and MAP reading comprehension scores and her treating psychiatrist's testimony at the administrative hearing.  The Court is not persuaded by either.  The scores mentioned by the plaintiffs were isolated results from two of the tests administered in the District's reevaluation.  In fact, the District's Reevaluation Report contained well over two hundred test scores, which were comprehensively summarized in the H.O.'s decision, and which concluded that S.H. was at or above grade-level in most areas. With regard to the testimony of the treating psychiatrist, the persuasiveness of such testimony is limited due to the fact that the psychiatrist never observed S.H. in school or at home.  The Court agrees with the H.O. that in this case, the testimony of direct observers of S.H.'s behavior, both in school and at home, outweigh the opining of this witness.

2.   "Other Health Impairment"

Parents also argue that S.H.'s attention deficit hyperactivity disorder (ADHD) diagnosis should entitle her to IDEA eligibility under the IDEA's definition of an "other health impairment."  34 C.F.R. § 300.8(c)(9).  The IDEA's definition of "other health impairment" also includes a requirement that the behavior adversely affects the student's educational performance.  Id.

In their argument that S.H. is eligible under the IDEA under both "emotional disturbance" and "other health impairment" for her ADHD, Parents do not make any legal distinctions between the two classifications, nor do they put forth any facts that relate to one classification and not the other.  As such, for the reasons discussed above, the Court also finds that S.H.'s ADHD did not have an adverse effect sufficient to trigger IDEA eligibility.

Thus, the Court holds that the Hearing Officer was correct in finding that S.H. was not IDEA-eligible for her emotional disturbance or her ADHD because the behaviors did not adversely affect her educational performance.  It next analyzes whether, in this context, S.H. was provided FAPE during her time within the District.

23

B.    <u>Rights Under the IDEA</u>

          Under the IDEA, every state accepting federal special education funds is tasked with identifying students who, as a result of their disabilities, require special education, and ensuring that each such student receives FAPE.  20 U.S.C. § 1412(a)(1).

          The Supreme Court has held that a student receives an appropriate education if the district provides instruction "sufficient to confer some educational benefit upon the handicapped child."  <u>Rowley</u>, 458 U.S. at 200; <u>see also</u> <u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 533 (3d Cir. 1995).  The <u>Rowley</u> standard does not require that a District provide the "optimal level of services;" instead, the IDEA only requires an IEP providing a "basic floor of opportunity."  <u>Id.</u>  Thus, an IEP will satisfy the IDEA if it is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential."  <u>D.S.</u>, 602 F.3d at 557 (internal citations omitted).

          FAPE is child-specific and must meet the unique educational needs of the child for whom the IEP has been developed.  20 U.S.C. § 1401(29).  Education professionals are given discretion in making judgments about the substantive

24

content of a student's IEP.  Latasha A. v. Houston Indep. Sch.
Dist., 629 F.3d 450, 454 (5th Cir. 2010); A.B. v. Lawson, 354
F.3d 315, 326 (4th Cir. 2004) (internal citations omitted).  As
a result, an administrative determination of the appropriateness
of an IEP is entitled to a "prima facie correct" standard.
S.H., 336 F.3d at 271.

Here, Parents challenge the Hearing Officer's holding
that S.H. was offered FAPE during the 2010-11 school year.
Their allegations include the school year itself as well as the
denial of ESY services for both summers.  The Court affirms the
H.O.'s holding.

### 1.   2010-11 School Year

Parents contend that the services offered by the
District, through its IEP team,[14] did not provide S.H. FAPE.
Their argument is two-fold.  First, they argue that the District
never meaningfully evaluated S.H. for her emotional disturbance
and ADHD until the Reevaluation Report in September 2011.

---

[14] There are two IEPs at issue:  the June 2010 IEP, which took
place before S.H. began her year in the District, and the April
2011 IEP, which took place after S.H.'s monthlong stay at
Devereaux.  Both were judged sound by the H.O.

Second, they argue that the IEPs "did nothing whatsoever to address S.H.'s complex behavioral and educational problems." Pl. Mot. at 31.

As to the first argument, it is without merit.  The H.O.'s factual findings persuasively state that behavior was comprehensively assessed in the February 09 Report.  In addition, the IEP team discussed S.H.'s behavior at the June 2010, September 2010, and April 2011 meetings.  For instance, S.H.'s summer tantrums were a subject of discussion at the September 2010 meeting.  At that point, the IEP team decided against offering additional services; in fact, Parents signed the corresponding NOREP, formalizing their agreement with the District's recommendation.  At the April 2011 IEP meeting, Parents expressed their belief that the IEP should reflect S.H.'s need for behavioral support.  However, the District felt that those issues were not surfacing in the school environment to the extent that the issues needed to be addressed in that particular IEP.

As to the second argument, the June 2010 and April 2011 IEPs made certain accommodations to address S.H.'s behaviors.  The June 2010 IEP noted Parents' concern regarding S.H.'s behaviors, and then recommended that the teacher provide

26

opportunities for S.H. to "remove herself from frustrating
situations" and "express frustrating situations to the teacher."
Pl. exh. 10 at 15.  The April 2011 IEP provided more detail.  It
recommended the use of social narratives and games to practice
the use of appropriate social skills.  It also referred to the
implementation of a recess aide and a recess plan to address the
Parents' concern that S.H. had experienced conflict during
recess.  Pl. exh. 14 at 14-15.

Whether such procedures were sufficient to address
S.H.'s behavior is a matter of professional judgment and subject
to deference.  Given that the IEP team had previously found that
S.H. was not IDEA-eligible for her behavior, it was reasonable
for them to provide a less-detailed action plan.  Parents argue
that the evaluations were not sufficiently "meaningful," but
such a conclusion requires that the Court second-guess the
professional judgment of educational authorities as to the
substantive content of a student's IEP.  The Court affirms the
Hearing Officer's holding that the District and its IEP team
provided S.H. FAPE during the 2010-11 school year.

2.   <u>ESY Services During Summer 2010 and 2011</u>

Parents also contend that the District should have offered extended school year (ESY) services to S.H..  In Pennsylvania, ESY services are made available if a student's IEP team determines that they are "necessary for the provision of FAPE."  34 C.F.R. § 300.106(a)(2).  In considering whether a student is eligible for ESY services, the IEP team is to consider, <u>inter alia</u>, regression (whether "the student reverts to a lower level of functioning as evidenced by a measurable decrease in skills or behaviors which occur as a result of an interruption in educational programming") and recoupment (whether the student has "the capacity to recover the skills or behavior patterns in which regression occurred").  22 Pa. Code § 14.132(a)(2)(i-iv).

The Court holds that S.H. was not denied FAPE when she was not placed in ESY for Summer 2010.  At that point, the IEP team did not have sufficient information to find S.H. eligible for ESY.  The District's decision was made prior to S.H.'s eventual hospitalization due to her tantrums.  Academically, S.H. had met expectations for second grade at private school. It was reasonable for the IEP team to reach the conclusion that ESY was not needed.

28

Indeed, it was still reasonable not to offer ESY Services for Summer 2011.  A factor of ESY eligibility is whether the student would "revert[] to a lower level of functioning . . . as a result of an interruption in educational programming."  22 Pa. Code § 14.132(a)(2).  S.H.'s parents had consistently maintained that S.H.'s tantrums were triggered by school-related stresses.  It would be reasonable for the District to conclude that ESY – that is, extra time in school – would not be to her educational benefit.

C.   Remedies

Finally, the parties seek a judgment regarding whether the plaintiffs are entitled to compensatory education, tuition reimbursement, or expert witness fees.  Once the Court has determined that the District failed in its obligation to provide a student with FAPE, the plaintiff may be entitled to a series of remedies, including compensatory education and tuition reimbursement.  In the instant case, the Court has held that the District has satisfied its obligation to provide S.H. FAPE; as a result, Parents are entitled to no such remedies.

Thus, the Court affirms the Hearing Officer's decision in its entirety.  The primary legal issue before the Court is

whether S.H.'s behavioral issues qualify her for special education under the IDEA's definition of emotional disturbance. The plaintiffs have not put forth sufficient evidence that S.H.'s behaviors had an adverse effect on her educational performance.  Under the IDEA and the Supreme Court's holding in Rowley, the District's actions afforded S.H. FAPE throughout her time in the District.  The Court grants the defendant's motion for judgment on the administrative record.  It denies the plaintiffs' motion seeking the same.

An appropriate order shall issue separately.